**PAUL J. HETZNECKER, ESQUIRE**
**Attorney I.D. No. 49990**
**1420 Walnut Street, Suite 911**
**Philadelphia, PA 19102**
**(215) 893-9640**                                              **Attorney for Plaintiff**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| **ALFONSE BOWMAN** | : | |
| **417 Knorr Street** | : | |
| **Philadelphia, PA  19111** | : | |
|         **Plaintiff** | : | |
|        **v.** | : | |
| **POLICE OFFICER JOHN DOE I** | : | **CIVIL ACTION NO:** |
| **Badge No. Unknown** | : | |
| **In his individual and official capacity** | : | |
| **c/o City of Philadelphia** | : | |
| **Law Department** | : | |
| **1515 Arch Street** | : | **JURY TRIAL DEMANDED** |
| **Philadelphia, PA 19103** | : | |
|        **and** | : | |
| **POLICE OFFICER/SERGEANT** | : | |
| **JOHN DOE II** | : | |
| **Badge No. Unknown** | : | |
| **In his individual and official capacity** | : | |
| **c/o City of Philadelphia** | : | |
| **Law Department** | : | |
| **1515 Arch Street** | : | |
| **Philadelphia, PA 19103** | : | |
|        **and** | : | |
| **CITY OF PHILADELPHIA** | : | |
| **City of Philadelphia - Law Department** | : | |
| **1515 Arch Street, 15ᵗʰ Floor** | : | |
| **Philadelphia, PA 19103** | : | |
| | : | |
|        **Defendants** | : | |

---

## COMPLAINT

1.  This is a complaint for money damages brought pursuant to 42 U.S.C. §1983 and

1988, as well as the Fourth and Fourteenth Amendments to the United States Constitution, and
under the Commonwealth of Pennsylvania Constitution. Jurisdiction is based upon 28 U.S.C.

§1331 and 1343 and, pendent jurisdiction of this court to consider claims under state law.

## PARTIES

2.      Plaintiff, Alfonse Bowman, is an adult citizen and at all times relevant to this Complaint,

a resident of the City of Philadelphia. The Plaintiff was nineteen (19) years old at the time of the

incident.

3.      Defendant, Police Officer John Doe I, Badge Number unknown, at all times relevant to

this Complaint was a police officer in the Philadelphia Police Department, acting under the color

of state law. Upon information and belief, Defendant Police Officer John Doe I was assigned to

an unknown District at the time of the incident. He is sued in both his individual, as well as in

his official capacity.

4.      Defendant, Police Officer/Sergeant John Doe II, Badge No. unknown, at all times

relevant to this Complaint was a police supervisor, believed to be a Sergeant, Lieutenant, in the

Philadelphia Police Department, acting under the color of state law. Upon information and belief,

Defendant Police Sergeant/supervisor, wearing a white shirt, was assigned to an unknown

District at the time of the incident. He is sued in both his individual, as well as in his official

capacity.

5.      Defendant City of Philadelphia, Pennsylvania is a municipal corporation and the public

employer of the individually named Defendants, Police Officer, John Doe I and Police

Sergeant John Doe II.

## FACTS

6.      On October 27, 2020 Plaintiff, Alfonse Bowman, a student at Morehouse College, was home from college visiting his parents in Philadelphia PA. During the evening hours Plaintiff was traveling with two friends, sisters Jordan and Amil Bradley in their vehicle in the area of West Philadelphia. Jordan Bradley was driving the vehicle while the Plaintiff was in the back passenger seat and Jordan Bradley's sister, Amil, was seated in the front passenger seat.   On that same date there were protests taking place as the result of the killing of Walter Wallace, a mentally ill resident of West Philadelphia who was shot by Philadelphia Police officers several days prior. Earlier in the year there were numerous marches and demonstrations against police brutality in Philadelphia, specifically, protests against the use of deadly force by Philadelphia Police against young black men. On the above date the occupants of the vehicle, Plaintiff, Jordan and Amil Bradley turned down a street near the protests stopping near the corner of N. Ruby Street and Chestnut Street. Immediately, the Plaintiff began taking photographs with his cell phone.

7.      In matter of seconds, Philadelphia Police officers dressed in tactical/SWAT uniforms converged on the protesters, causing the protesters to run from the area all while the Plaintiff and the two other occupants of the vehicle were stopped at the corner watching Philadelphia Police officers chase the protesters.

8.      During the chase, the Plaintiff observed an unidentified police officer running with a shield in one hand, jump and slide across the hood of a nearby vehicle using his free hand to brace himself against the hood of the vehicle. Impressed by the athleticism of the Police Officer's maneuver Plaintiff yelled out the passenger window "Whoa!" The Philadelphia Police officer who slid across the hood of the vehicle looked back and responded with a "Whoa!"

9.      Immediately following the unidentified Officer's verbal response to the Plaintiff, a second unidentified police officer, Defendant Philadelphia Police Officer John Doe I, who was also chasing the protesters and running behind the other Philadelphia Police officers, without just cause or legal justification, took his metal asp and swung it forcefully through the open backseat passenger window and struck the Plaintiff in the face while the Plaintiff was seated in the vehicle.

10.     Specifically, Defendant John Doe I swung his asp, a collapsible metal rod approximately two feet in length or a baton, and smashed Plaintiff's face, striking the Plaintiff on his left eye socket. Plaintiff instantly screamed in pain. Plaintiff did not lose consciousness but was dizzy as a result of the blow to his face. Defendant Police Officer John Doe I continued to chase the protesters. Plaintiff only observed Defendant Police Officer John Doe for only a moment but was able to provide a partial description. The Plaintiff later described the Defendant John Doe I as a short white male wearing black SWAT gear, including a helmet.

11.     Jordan Bradley, who had been taking video with her cell phone of the police running by immediately stopped taking video and drove away from the scene in search of help for the Plaintiff.

12.     As Jordan Bradley, her sister Amil and the Plaintiff reached the intersection of 52nd and Market Streets in Philadelphia they observed an older white Philadelphia Police Officer wearing a white shirt, believed to be a sergeant and referred to herein as Defendant Police Sergeant John Doe II.

13.     As the Plaintiff and the Bradley sisters pulled up next to Defendant Police Sergeant John Doe II, they informed Defendant Police Sergeant John Doe II that the Plaintiff had been struck in the left eye socket by Defendant Police Officer John Doe I just a few minutes prior. Defendant

Sergeant John Doe II told them that there was nothing he could do about it and refused to take a report or call for medical assistance for the Plaintiff.

14.    Eventually, Jordan Bradley drove Plaintiff home. Upon arrival the Plaintiff's condition was clearly visible to his parents. The Plaintiff informed his parents of the assault and his mother immediately drove him to Abington Hospital for treatment. Following an examination in the emergency room the Plaintiff was diagnosed with an acute fracture through the left inferior orbital rim and floor, lamina papyracea, anterior walls of the left maxillary antrum and bilateral nasal bones.

15.    Following his emergency visit the Plaintiff was referred to a specialist for a surgical consultation. A few days following the surgical consultation the Plaintiff underwent surgery to repair the broken bones in his face that occurred from the blow he suffered when Defendant Police Officer, John Doe I struck him in the face with an asp. The bones on the left side of Plaintiff's face including the bones supporting his nose and eye socket were shattered. The surgeon had to insert a titanium plate into the Plaintiff's face in order to support the left eye socket. Surgery was also performed on the Plaintiff's nose.

16.    As the result of the devastating injury suffered by the Plaintiff caused by the blow to his face by Defendant Police Officer, John Doe I, the Plaintiff had to endure a second surgery to his face in the summer of 2021.

17.    In addition to the physical pain the Plaintiff suffers on a daily basis, the Plaintiff also has suffered and continues to suffer emotional and psychological harm. The Plaintiff continues to receive psychological treatment stemming from the blow he suffered at the hands of Defendant Police Officer, John Doe I.

## COUNT I
## EXCESSIVE FORCE PURSUANT TO 42 U.S.C. §1983

18.    Paragraphs 1 through 17 of this Complaint are incorporated herein by reference.

19.    On or about October 27, 2020, Defendant Police Officer John Doe I without just cause and legal justification, did use excessive force upon the Plaintiff, by unlawfully striking Plaintiff in his face with his collapsible metal asp or baton, causing Plaintiff to suffer a serious injury to his left eye socket.

20.    As a direct and proximate cause of the Defendant Police Officer, John Doe I's unlawful use of excessive force, specifically, striking the Plaintiff in the face with his asp or baton, the Plaintiff suffered a fractured orbit and nasal bone, physical pain and suffering, some of these injuries, if not all may be permanent. Additionally, the Plaintiff suffered, and continues to suffer, psychological injury as a result of the actions of Defendant Police Officer John Doe I.

21.    The Defendant Police Officer John Doe I, acting under the color of state law, violated the Plaintiff's right to be free from the use of excessive force as guaranteed under the Fourth Amendment and Fourteenth Amendments of the United States Constitution, as well as 42 U.S.C. §1983.

## COUNT II
## FAILURE TO INVESTIGATE OR PROVIDE ASSISTANCE PURSUANT TO 42 U.S.C. §1983

22.    Paragraphs 1 through 21 of this Complaint are incorporated herein by reference.

23.    On or about October 27, 2020, Defendant Police Supervisor John Doe II, while acting under the color of state law, refused to investigate the Plaintiff's claim that he was struck by another Philadelphia Police officer, who had used excessive force on the Plaintiff causing serious visible injury to the Plaintiff.  Defendant Police Supervisor, John Doe II refused to act without

legal justification, while acting under the color of state law, did with deliberate indifference refused to investigate the actions of Defendant Police Officer John Doe I, specifically the excessive force against Plaintiff.

24.    On that same date and time Defendant Police Supervisor, John Doe II refused to provide assistance to the Plaintiff who was seriously injured and in dire need of medical treatment which was against Philadelphia Police policy.

25.    As a direct and proximate cause of the Defendant Police Supervisor, John Doe II, the Plaintiff suffered prolonged physical and emotional pain, as well as psychological harm, as set forth herein, some of these injuries, if not all may be permanent.

26.    The Defendant Police Supervisor, John Doe II, acting under the color of state law, violated the Plaintiff's right to be provided with prompt police service as guaranteed under the Fourth Amendment, Fourteenth Amendment and the Due Process Clause of the United States Constitution, as well as 42 U.S.C. §1983.

## COUNT III
## CITY OF PHILADELPHIA PURSUANT TO 42 U.S.C. §1983

27.    Paragraphs 1 through 26 are incorporated herein by reference as though fully set forth.

28.    Prior to the date of this incident, the City of Philadelphia developed and maintained policies, a pattern of practice and/or customs exhibiting deliberate indifference to the constitutional rights of individuals during the course of arrests, including the policy regarding use of force, and specifically, the policy for the proper use of the asp or baton, which caused a violation of Plaintiff's rights in this case.

29.    It was the policy and/or custom of the City of Philadelphia to inadequately and improperly investigate claims that the Philadelphia Police had used excessive force, including

investigating the improper use of the asp or baton while officers were acting under the color of state law.

30.     It was the policy and/or custom of the City of Philadelphia to inadequately supervise, train, retrain, and discipline its police officers, including the Defendant Police Officers, engaged in excessive force, and specifically improper use of the asp or baton, and thereby failing to adequately discourage further constitutional violations on the part of its police officers.  The City of Philadelphia did not require appropriate in-service training or retraining and or/discipline of its officers who were known to have engaged in use of excessive force, specifically the improper use of the asp and baton.

31.     As a result of the above-described policies, pattern and practice and customs, police officers of the City of Philadelphia, including the Defendant Police Officers, believe that their actions would not be properly monitored by supervisory officers, and that the misconduct, including the use of excessive force, and improper use of the asp or baton would not be investigated or sanctioned, but rather would be tolerated.

32.     The above-described policies and customs demonstrate a deliberate indifference on the part of the policymakers of the City of Philadelphia, to the constitutional rights of persons within the City, specifically, the Fourth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. Section 1983, and were the cause of the violations of  Plaintiff's rights alleged therein.

33.     Over the course of time the City of Philadelphia established a policy, pattern or practice and/ or custom of exhibiting deliberate indifference, and or ignoring the constitutional rights of individuals engaged in peaceful protest, specifically, failing to properly train, supervise, re-train,

disciple or discourage the use of excessive force by Police officers against peaceful protesters.

The following references to specific incidents of excessive force used by Philadelphia

Police officers against peaceful protesters reflect that policy, pattern or practice and/or or custom

established by the City of Philadelphia. The below mentioned references do not reflect a complete

list of the evidence in support of the claim against the City of Philadelphia.

34.    On May 30, 2020, Torin Smith and Amanda Geraci were on Broad Street serving as

Legal Observers during the protest when they heard through the crowd of protesters that an

individual was arrested by the Philadelphia Police in front of the Arch Street Methodist Church

at 55 North Broad Street, Philadelphia, Pennsylvania. Smith and Geraci moved through the

crowd in order to get closer to the where the protester was being arrested. Torin Smith and

Amanda Geraci were wearing bright green t-shirts with large letters identifying them as Legal

Observers.

35.    Once Torin Smith and Amanda Geraci arrived at the Arch Street Methodist

Church, they observed the arrest of a protester by Philadelphia Police Officers. They approached

the protester and informed him that they would provide the legal team with his information, as

well as family and friends so that they could assist him.

36.    In the area of Broad Street and Arch Street, Philadelphia, Pennsylvania, Torin Smith and

Amanda Geraci observed police escort the protester through the crowd. Torin Smith and

Amanda Geraci followed behind the Philadelphia police officers and the protester.

37.    As they followed the arresting officers, several additional Philadelphia Police Officers

approached them both. Torin Smith was several yards behind the arresting officers and the

protester under arrest while Geraci was holding onto the back of Mr. Smith's bright green Legal
Observer shirt.

38.    Without provocation or legal justification Torin Smith was struck in the chest with a
baton/asp wielded by unknown Defendant Philadelphia Police Officer. Immediately,
Torin Smith fell to the ground disoriented and in pain.

39.    Shortly after Torin Smith fell to the ground from the force of Defendant Philadelphia
Police's blow, Amanda Geraci attempted to assist Torin Smith to his feet at which point Amanda
Geraci was struck in the face with an asp/baton by the same Defendant Philadelphia Police
Officer John Doe. Torin Smith and Amanda Geraci were struck with the asp/baton wielded by
the same unknown Philadelphia Police Officer.

40.    Upon receiving the blow to the face from the unknow Philadelphia Police Officer's
asp/baton Geraci immediately lost consciousness and collapsed.

41.    Although still suffering from the blow to his chest, Torin Smith was able to recover and
assist Amanda Geraci to her feet and helped her to regain consciousness by talking to her.
Shortly after Torin Smith was able to assist Amanda Geraci, they were separated from one
another.

42.    Torin Smith was later treated by an on-scene medic providing general medical assistance
to the protesters. The medic informed Torin Smith that he/she believed that Torin Smith did not
suffer a concussion.  However, Torin Smith did suffer several visible bruises, including bruises
on his ribs. Torin Smith did not seek treatment at a hospital for his injuries.

43.    Amanda Geraci was treated by a medic on scene providing general medical

assistance to the protesters.  The medic treated Geraci for a concussion as the result of the

asp/baton strike to her face by an unknown Defendant Police Officer. Amanda Geraci was

eventually escorted home by friends.

44.    Later that afternoon Amanda Geraci was treated at a hospital for the concussion she

suffered as the result of the unknown Defendant Philadelphia Police Officer striking her in the

face with his asp/ baton. Amanda Geraci remained out of work for several weeks and continues

to suffer from the impact of the baton strike to her face. Upon information and belief there was

no filing of a use of force memorandum by the Officer responsible. Additionally, upon

information and belief there was no internal police investigation, discipline, training or retraining

of the Officer responsible.

45.    On May 30, 2020 Adam Al-Asad arrived in Center Philadelphia, Pennsylvania around

mid-day. Upon his arrival, Mr. Al-Asad could see the crowds and hear the police sirens. Mr. Al-

Asad met up with a friend and they joined the protest march in the area of Broad Street and Race

Street in Center City Philadelphia, PA. Mr. Al-Asad witnessed police officers beating protesters

with batons and spraying the protesters with pepper spray.

46.    While peacefully protesting with many others in the area of Broad Street and Race Street,

Mr. Al-Asad was struck in the face with pepper causing his eyes to burn.

Immediately, Mr. Al-Asad fled Broad and Race Street headed to Dilworth Plaza outside of City

Hall.

47.    While at Dilworth Plaza Mr. Al-Asad observed a line of police officers while emergency

personnel extinguished a fire at the Starbucks at that location.  While Mr. Al-Asad was watching

- 11 -

the fire crew he observed a line of Philadelphia Police Officers on bicycles riding through the crowd towards the line of Police Officers blocking the Starbucks.

48.     Mr. Al-Asad was standing with a crowd of onlookers when Philadelphia Police Officer Brian Belli, a bicycle officer, without just cause or legal justification, struck Mr. Al-Asad in the back with a metal pole. The force of the blow from Police Officer Brian Belli caused Mr. Al-Asad to fall to his knee which caused an injury to his knee. Mr. Al-Asad suffering from pain in his back and knee turned to see Philadelphia Police Officer Brian Belli staring at the him. Once Mr. Al-Asad was on his feet he observed the metal pole on the ground.

49.     After striking Mr. Al-Asad in the back with a metal pole, Philadelphia Police Officer Brian Belli joined the line of officers and started speaking to a police supervisor. Mr. Al-Asad approached Philadelphia Police Officer Brian Belli to talk to him about what happened. Philadelphia Police Officer Brian Belli and an unknown Police supervisor dressed in a white shirt both laughed at Mr. Al-Asad and ignored his request for an explanation as to why he was assaulted. Mr. Al-Asad then requested medical assistance for his injury and both Philadelphia Police Officer Brian Belli and the unknown Police supervisor refused to call for medical assistance.

50.     Eventually, Mr. Al-Asad was taken to Jefferson Hospital by a friend. Once at Jefferson Hospital Mr. Al-Asad was treated for a bruised tailbone and bruises on his lower back.

51.     On May 30, 2020, the same day that Geraci and Smith were struck by a Philadelphia Police Officer with an asp/ baton, and Mr. Al-Asad was struck with a metal pipe by another Philadelphia Police officer, a Philadelphia Police officer struck photojournalist Sam Trilling with a baton while Trilling was covering the protests in Philadelphia. Mr. Trilling was standing on a

barricade taking pictures of the police and protesters when a Philadelphia Police officer struck him once across the abdomen with a baton.

52.     Upon information and belief none of the Police Officers that engaged in excessive force mentioned above were subject to investigation, discipline, training or re-training. If any of the Philadelphia Police Officers were subject to any of the above, this did not deter the Defendant Philadelphia Police Officer John Doe I in this case from using excessive force against the Plaintiff in this case.

53.     On May 31, 2020 in residential and commercial areas in West Philadelphia, Philadelphia, PA,  Philadelphia police officers were dressed in full body armor and SWAT uniforms flanked an armored police vehicles engaged in crowd control methods against peaceable demonstrators and observers including indiscriminately firing tear gas canisters and flash bangs into crowds and at individuals and shooting projectiles at peaceable residents, demonstrators and observers. The police officers fired tear gas canisters at the residents, demonstrators and observers who were peacefully gathered in West Philadelphia on that date.

54.     On June 1, 2020, thousands of protesters marched through the streets of Center City Philadelphia, PA and made their way onto the Parkway. Upon their arrival on the Parkway many of the demonstrators marched onto I-676, the Vine Street Expressway.  The police officers did not attempt to stop the crowd and protesters continued to march along the highway chanting and carrying signs.  Drivers whose cars were stopped by the protesters honked their horns in support for the protesters. The march remained peaceable as hundreds of protesters moved along the highway through the overpass.  Without warning Philadelphia police officers began to fire tear gas canisters and rubber bullets at the peaceful demonstrators.  As the demonstrators began to flee Philadelphia police officers continued to fire at the demonstrators with tear gas and rubber

bullets.  Hundreds of demonstrators became trapped a steep grassy embankment as they tried to escape the highway and over the fence at the top of the embankment.  Many of the protesters could not escape and were trapped on the embankment. Philadelphia Police officers continued to fire tear gas canisters, pepper spray and rubber projectiles causing those trapped on the hill to suffer tear gas inhalation and other injuries from the rubber bullets and pepper spray.  The purpose of this demonstration was to protest police brutality in Philadelphia.  Ironically, as a result of Defendant Police Commissioner's decisions that day and the previous day they became victims of excessive use of force.  Many of the protesters that day suffered physical injuries including difficulty breathing, nausea, vomiting, bruises, injured limbs as well as more serious injuries. The protesters also suffered significant emotional trauma and distress.  In addition, the injuries resulting from tear gas and "non-lethal munitions."  there were many individuals injured by the excessive use of force by Philadelphia police officers as they used batons and/or metal asps to strike the peaceable protesters.

55.     The excessive force used by Philadelphia police officers on May 31, 2020 and June 1, 2020 is a continuation of a history of excessive force used by Philadelphia police officers against the residents and visitors engaged in peaceful protests or observing peaceful protests and police activity.

56.     On June 2, 2020 the day after the incident on the Vine Street Expressway Defendant Philadelphia Police Commissioner Danielle Outlaw issued a memorandum to all Philadelphia Police Department Officers establishing that the decision to use force on the Vine Street Expressway on June 1, 2020 was deliberate and that this decision was authorized by the City of Philadelphia policymakers, including Philadelphia Police Commissioner Danielle Outlaw. The intentional decision to use force on peaceful protesters by the City of Philadelphia

policymakers was implemented by hundreds of Philadelphia Police Supervisors and officers. The City of Philadelphia policymakers attempted to justify the use of force on peaceful protesters by embracing a fabricated narrative regarding what happened on that date.

57.     Following the publication on June 25, 2020 in the New York Times of a video taken by protesters at the scene which established that the protests on the Vine Street Expressway was non-violent and peaceable and that the force used on protesters was excessive the City of Philadelphia policymakers, including Commissioner Outlaw changed their public position.

58.     Within several hours of the publication of the New York Times investigation Philadelphia Mayor Jim Kenney and Defendant Police Commissioner Danielle Outlaw conducted a news conference in which they both apologized for the excessive use of force against peaceful protestors.  Shortly after that Mayor Kenney sent a message conceding that members of the Philadelphia Police Department used excessive force.  The decision by the policymakers from the Defendant Ci of Philadelphia, including Commissioner Outlaw, to shut down the Vine Street Expressway filled with demonstrators was a blatant unconstitutional attack on the protesters First and Fourth Amendment rights to the United States Constitution.

59.     On June 1, 2020 Staff Inspector Joseph Bologna of the Philadelphia Police Department used excessive force on a Temple student, Evan Gorski by striking him in the head with an asp, a metal baton designed to cause injury. The strike resulted in a laceration on the back of Mr. Gorski's head that required surgical staples.  Following the assault Staff Inspector Bologna and two other police officers fabricated criminal charges against Evan Gorski.

60.     Prior to June 1, 2020 it had been well documented that Staff Inspector Joseph Bologna had engaged in misconduct throughout his career all of which demonstrates the failure to train,

supervise and discipline Philadelphia police officers within the City of Philadelphia.  In August of 2009 it was reported that Staff Inspector Bologna's unit who at the time had been in charge of the unit had cut cords to surveillance cameras and/or stole money and merchandise.

61.     In April of 2014 the Philadelphia Inquirer published an article regarding Bologna and the same four officers under his command.  According to the Internal Affairs Division the allegations of misconduct had been sustained.  Specifically, Staff Inspector Bologna failed to properly supervise an officer who was present when that officer searched a vehicle without a warrant.  According to the Philadelphia police article the City of Philadelphia has settled thirty-three (33) lawsuits for a total of $1.7 million related to misconduct committed by Bologna and officers he supervised.  Despite his history the City of Philadelphia failed to discipline Bologna.  On the contrary his misconduct has been sanctioned by the City of Philadelphia as Inspector Bologna received promotions throughout the Philadelphia Police Department including the position of Staff Inspector he held as of June 1, 2020.

62.     Based on his history of misconduct the policymakers for the City of Philadelphia were well aware that Staff Inspector Bologna would act in an unconstitutional manner.  This risk increased once Staff Inspector Bologna was placed in a position to command a unit of officers deployed on bikes assigned to monitor protest activity.

63.     On June 2, 2020 Bologna was in the area of 10th and Market Streets in Center City when he encountered another protester, Caley Cohen. Without any legal justification Staff Inspector Bologna grabbed Ms. Cohen and threw her to the ground causing her injury.  Upon information and belief these two incidents of excessive force were covered on video and widely disseminated on social media.  Despite full knowledge of Bologna's actions on June 1st and June 2nd, 2020 the

City took did nothing to investigate or discipline Staff Inspector Bologna.  It was only after June

5, 2020 when the Philadelphia District Attorney's Office announced it was bringing criminal

charges against Bologna for the assault on Mr. Gorski that the City of Philadelphia finally took

action.  Despite the criticism and uproar and calls for reform of police training, as well as

supervising and disciplining officers, the City of Philadelphia and its policymakers, including

Commissioner Daniel Outlaw, the Philadelphia Police department did not significantly alter he

policies, practice and pattern and/or custom regarding the conduct of Philadelphia Police

Supervisors and officers during protests.

64.     On October 27, 2020 in response to the police-involved shooting of Walter

Wallace in West Philadelphia a series of protests took place.  In response to the police-involved

shooting of Walter Wallace the community, activists and protesters engaged in protest activity in

the area of West Philadelphia.

65.     Similar to the orders issued by Police Commissioner Outlaw and other policy makers for

the Philadelphia Police Department ordered on May 31, 2020 and June 1, 2020, the SWAT team

again was deployed to the area of West Philadelphia.  Upon information and belief none of the

officers' names or badge numbers were displayed publicly for easy identification by observers.

66.     On or about October 27, 2020, the same night Plaintiff was struck by Defendant

Philadelphia Police Officer John Doe I,  Rickia Young was driving home with her two (2) year

old son and sixteen (16) year old nephew when she encountered a group of protesters just hours

after police fatally shot Walter Wallace, Jr., a black man whose family had called for mental

health assistance.  Immediately, Philadelphia Police officers wearing SWAT gear and wheeling

asps and batons smashed Ms. Young's windows and pulled her and her nephew from the vehicle

and beat them causing significant injuries. Ms. Young's two (2) year old son was taken by police and she was separated from her son for several hours. After Ms. Young was taken into custody the upon information and belief, the Fraternal Order of Police, shared a photo on Facebook of an officer holding her son with the caption claiming the child was wandering around by himself during protests.

67. Upon information and belief, the police officers that engaged in previous misconduct during May 30, 2020 through June 1, 2020 incidents six months prior, were not subject to training, re-training or discipline. Furthermore, upon information and belief no substantive policy changes were made or implemented following the protests in late May and early June of 2020 that changed the conduct of the Philadelphia police officers and supervisors. The failure to implement such changes and procedures were the direct cause of the injuries suffered by the Plaintiff in this case, as the Defendant Police Officer, John Doe I knew that he could commit excessive force without consequence. Rather than change policy, practice or pattern of practice or custom stemming from the widespread use of excessive force during May and June 2020, the Philadelphia Police Department commissioned a report prepared by CNA and a law firm in an effort to justify the excessive use of force against peaceful protesters.

68. Despite full knowledge of the history of excessive use of force by Philadelphia police, especially during protests, Police Commissioner Danielle Outlaw and policymakers for the City of Philadelphia failed to address the blatant use of excessive force during protests as recently as five months prior and did nothing to retrain, discipline or adequately supervise those officers and supervisors engaged in responding to the protests on October 27, 2020, the night that Plaintiff Alfonse Bowman was brutally struck in the face with a metal asp by Defendant Police Officer John Doe I.

69.     Before May of 2020 and certainly prior to October of 2020, the Philadelphia police had developed plans to address massive protests.  These plans included utilizing hundreds of police officers to engage in crowd control that would allow peaceful protests and marches to occur with minimal interference.  In addition to using police officers to conduct crowd control the Philadelphia Police Department Civil Affairs Unit is trained regarding the rights of persons engaged in political expression and in addressing crowd control issues arising from large protests and demonstrations.  The officers are trained to deescalate situations involving protesters. Within days following the murder of George Floyd a national protest movement emerged to address the police involved killings of unarmed black men. The Philadelphia Police Department was well aware that large protests and demonstrations may occur in Philadelphia.  Despite this knowledge none of the policymakers or leadership in the Philadelphia Police Department, including Commissioner Danielle Outlaw implemented any of their previous existing operational plans to ensure the safety of the public and the demonstrators.

70.     On May 30, 2020 there was damage to police vehicles and vandalism of stores that occurred in various sections in the City of Philadelphia, including West Philadelphia. In response, on May 31, 2020, Police Commissioner Danielle Outlaw and policymakers from the City of Philadelphia ordered the SWAT team armed with riot gear deployed to West Philadelphia. The SWAT team fired tear gas at the locations where the looting occurred. However, the Philadelphia police officers did not stop there continuing to fire tear gas and rubber bullets throughout the residential areas surrounding 52nd Street resulting in excessive use of force against non-violent protesters, as well as residents many who were inside their homes or outside on their properties.

71.     On May 31, 2020 based upon the actions of the Philadelphia Police Department

policymakers including Defendant Police Commissioner Danielle Outlaw implemented a plan to

use excessive force against demonstrators.  This same plan to utilize excessive force on

demonstrators continued into the next day on June 1, 2020 as Philadelphia police officers

dressed in full SWAT military gear fired tear gas canisters, rubber bullets, pepper spray and

utilized batons and asps against peaceful protesters demonstrating throughout the City of

Philadelphia and including those who were marching on I-676, the Vine Street Expressway.  The

decisions by the policymakers the City of Philadelphia including the Police Commissioner

Danielle Outlaw resulted in use of excessive force while dealing with peaceful demonstrators

knowing that they would not be held accountable for their excessive use of force.  The

continuation of this policy by the Philadelphia Police Department, Police Commissioner

Danielle Outlaw and other policymakers is exemplified by the actions of the Philadelphia Police

Department against the protesters following the police-involved killing of Walter Wallace, Jr. in

October of 2020.  The actions and conduct of the Philadelphia Police officers assigned to address

crowd control in October 2020 continued a policy, pattern and practice and /or custom of

excessive use of force was demonstrated in the police response to a driver, Ms. Young, who

mistakenly came upon the protests and was attempting to leave the area when she was brutally

assaulted by multiple Philadelphia police officers who attacked her car with batons and asps

breaking her windows and pulling her from the car causing serious injury to her arm.

72.     This policy, pattern and practice of sanctioning excessive use of force or failing to

supervise, train or discipline officers engaged in excessive use of force is a direct cause of the

actions of the Defendant Philadelphia Police Officer John Doe I in this case who utilized his asp

and struck the Plaintiff in the face causing severe facial injuries.  This pattern and practice,

policy or custom is reflected in the actions by Defendant John Doe II, Sergeant, Supervisor, located a short distance from the scene who failed to provide any assistance to the Plaintiff and failed to attempt to identify Defendant Philadelphia Police Officer John Doe I who used excessive force against the Plaintiff with his asp.

73.    Over the course of time the City of Philadelphia established a policy, pattern and practice and/ or custom of exhibiting deliberate indifference, and or ignoring the constitutional rights of individuals engaged in peaceful protest, specifically, failing to properly train, supervise, re-train, disciple or discourage the use of excessive force by Police officers against peaceful protesters, all of which was a direct cause of the actions by Defendant Police Officer John Doe I and Defendant Police Supervisor John Doe II, which constituted excessive use of force against the Plaintiff.

74.    The above-described policies and customs demonstrate a deliberate indifference on the part of the policymakers of the City of Philadelphia, including Commissioner Danielle Outlaw, to the constitutional rights of persons within the City, specifically, the Fourth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. Section 1983, and were the cause of the violations of Plaintiff's rights alleged herein.

## COUNT IV

## COMMON LAW ASSAULT AND BATTERY

75.    Paragraphs 1 through 74 of this Complaint are incorporated herein by reference.

76.    As a result of the actions and conduct of Defendant Police Officer, John Doe I without just cause or lawful reason, committed assault and battery on the person of the Plaintiff by striking the Plaintiff in the face with an asp resulting in serious bodily injury to the Plaintiff which may be permanent.  Additionally, Plaintiff suffered and continues to suffer psychological

injury, emotional distress, humiliation and embarrassment as a result of the actions of Defendant Police Officer, John Doe I.

77.    As the direct and proximate cause of Defendant Police Officers' unlawful actions, the Plaintiff suffered physical harm, psychological injury, emotional pain and suffering.

WHEREFORE, the Plaintiff requests the following relief:

(a)    Compensatory damages to the Plaintiff against the Defendants jointly and severally;

(b)    Punitive damages to the Plaintiff against the Defendants jointly and severally;

(c)    Reasonable attorney's fees and costs to the Plaintiff on Counts       of the Complaint;

(d)    Such other and further relief as appears reasonable and just.

/S/ Paul J. Hetznecker, Esquire
Paul J. Hetznecker, Esquire
Attorney for Plaintiff

Date:        May 25, 2022